**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RODERICK LIM GO,
                    *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 06-71575

Agency No.
A095-617-600

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 9, 2011—Pasadena, California

Filed May 5, 2011

Before: J. Clifford Wallace and Susan P. Graber, Circuit
Judges, and Richard Mills,* Senior District Judge.

Opinion by Judge Wallace

---

*The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

## COUNSEL

P. Joseph Sandoval, Gallagher Sandoval, PC, Los Angeles, California; and Robert G. Berke, Berke Law officers, Canoga Park, California, for the petitioner.

C. Erb, Jr., and Don G. Scroggins, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

## OPINION

WALLACE, Senior Circuit Judge:

Roderick Lim Go petitions for review from a decision of the Board of Immigration Appeals (Board) denying his claims for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). We have jurisdiction pursuant to 8 U.S.C. § 1252(b), and we deny Go's petition.

## I.

Go, a native and citizen of the Philippines, entered the United States in early 2003 pursuant to a non-immigrant visa. Though his visa expired in August 2003, Go did not depart or otherwise obtain authorization to remain in the United States. In November 2003, Go was charged with being a removable alien for overstaying the term of his temporary visa.

Go contested removability and filed an application for asylum, withholding of removal, and protection under the CAT. Go alleged that he and his wife, Grace Tan Go,[1] would be subject to a sham criminal prosecution in the Philippines if removed to that country. According to Go, he and his wife had been falsely charged with kidnapping James King, a member of a prominent family that resides in the Cebu region of the Philippines. Go and his wife assert that they fled to the United States to escape prosecution and to avoid retaliation by the King family, which allegedly has significant political influence over the government in Cebu. With respect to the

---

[1]We address Tan Go's claims in a memorandum decision filed concurrently with this opinion.

CAT, Go averred that he would be subject to torture if he were held in a Philippine detention facility pending his trial for kidnapping.

At his August 2004 removal hearing before an immigration judge (IJ), Go and the government each presented several witnesses, affidavits, and other documentary evidence describing the Philippine criminal justice system and the kidnapping charges against the Gos. Go testified that he had become involved in a drug-trafficking organization operated by King in early 2002. Together, Go and King devised a "check kiting" scheme to finance the purchase of illegal narcotics. Approximately six months after Go joined the scheme, however, he and King had some sort of falling out. The evidence supported two versions of what happened: either Go kidnapped and assaulted King over a financial disagreement, or King fabricated the charges to conceal his role in the illegal scheme.

At the conclusion of the hearing, the IJ determined that the evidence weighed against granting Go's claims for relief. Relying on Go's admission to being involved in an illegal drug-trafficking scheme, the IJ found him statutorily ineligible for asylum and withholding of removal. With respect to Go's claim that his kidnapping charges were pretext for government persecution, the IJ concluded that the charges had been initiated as part of a legitimate criminal prosecution. *See Chanco v. INS*, 82 F.3d 298, 301 (9th Cir. 1996) (holding that "[p]ersons avoiding lawful prosecution for common crimes are not ordinarily deemed refugees"). Then, relying on a government witness, who testified that Go would not be tortured in a Philippine detention facility while awaiting trial, the IJ concluded that Go failed to carry his burden of demonstrating eligibility for relief under the CAT.

The Board denied Go's subsequent appeal in two separate orders. In a May 2005 order, the Board agreed with the IJ that Go was statutorily ineligible for asylum and withholding of

removal. Go's CAT claim, however, was remanded for further proceedings. According to the Board, the IJ may not have considered various country reports suggesting a relatively high frequency of abuse and mistreatment in Philippine detention facilities. The Board also expressed concern that the IJ had improperly excluded testimony from a Philippine defense attorney, who was familiar with the kidnapping charges filed against Go.

After the IJ held additional proceedings, which addressed these concerns, the Board issued a March 2006 order rejecting Go's claim for relief under the CAT. Relying on new evidence that had been introduced on remand, the Board concluded that Go was unlikely to be tortured in a Philippine detention facility. In a divided decision, the Board emphasized that one of Go's co-defendant's in the kidnapping, who had been detained pending trial, had not been tortured or otherwise mistreated. The Board also cited the testimony of Cezar Tajanlangit, a former prosecutor in the Philippines, who testified that torture was uncommon in the facility where Go would be detained. Relying on Tajanlangit's testimony, the Board reasoned that the potential for torture was reduced because the kidnapping charges against Go had generated significant media attention in Cebu. The "notoriety" of the kidnapping case, the Board explained, "makes it unlikely that an ill-intentioned officer would believe that he could abuse [Go] without being reported in the press." The Board further concluded that torture in a government detention facility was not likely because the Philippine Justice Department had recently issued a resolution calling for the dismissal of the kidnapping charges levied against Go.

Go now petitions for review of the Board's May 2005 order denying his claims for asylum and withholding of removal and its March 2006 order denying his claim for protection under the CAT.

## II.

Before addressing the merits of Go's petition for review, we first consider the parameters of our jurisdiction over his claims. Under the Immigration and Nationality Act (INA), an alien must file his petition for review "not later than 30 days after the date of the final order of removal." 8 U.S.C. § 1252(b)(1). Here, the Board denied Go's asylum and withholding claims in a May 2005 order, but remanded Go's CAT claim for further proceedings. Go's CAT claim was then rejected in a March 2006 order. Because Go did not appeal the Board's denial of his claims for asylum and withholding of removal within thirty days of the May 2005 order, the government asks us to clarify whether we have jurisdiction to review those claims.

Our jurisdiction extends to each of Go's claims for relief, including his asylum and withholding claims. The Board's May 2005 order may have been the final administrative decision with respect to Go's eligibility for asylum and withholding relief, but that decision was not a final order of removal because it left open the possibility that Go might obtain CAT relief. Under the INA, an order of removal does not become administratively final until the earlier of a "(i) a determination by the Board of Immigration Appeals affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." 8 U.S.C. § 1101(a)(47)(B). Because the Board remanded Go's CAT claim for further proceedings, his removal order did not become final until the Board rejected all claims. *See id.* As the Supreme Court has explained, "the term 'final order[ ]' . . . includes all matters on which the validity of the final order is contingent." *See INS v. Chadha*, 462 U.S. 919, 938 (1983) (some internal quotation marks omitted). Here, Go's final order of removal is contingent, at least in part, on the denial of his claim for asylum, his withholding claim, and his claim pursuant to the CAT. We therefore have jurisdiction to consider each of these claims. *See id.*

Our analysis holds true notwithstanding our decision in *Castrejon-Garcia v. INS*, 60 F.3d 1359 (9th Cir. 1995). There, we held that a remand to the Board for the sole purpose of considering an alien's request for voluntary departure did not affect the finality of the Board's removal order. *Id.* at 1361-62. We reached this conclusion because the removal decision was final, that is, the immigration tribunals had definitively resolved that petitioner Castrejon-Garcia would be required to leave the United States (whether voluntarily or involuntarily). *Id.* at 1362. Here, on the other hand, the Board's remand of Go's CAT claim left open the possibility that he would obtain relief from removal. *See* 8 C.F.R. § 1208.17(a) (providing that an alien is entitled to deferral if "he or she is more likely than not to be tortured"). Accordingly, because Go's removal order did not become final until the Board rejected each of his claims for relief, and given that Go filed his petition for review of all three claims within thirty days of the Board's March 2006 final order, our jurisdiction extends to each of his claims.

## III.

Having determined that jurisdiction is proper, we turn now to the merits of Go's petition. The INA bars an applicant from obtaining asylum and withholding relief when "there are serious reasons" to believe that he or she "committed a serious nonpolitical crime" before arriving in the United States. 8 U.S.C. §§ 1158(b)(2)(A)(iii) (asylum), 1231(b)(3)(B)(iii) (withholding). We interpret " 'serious reasons' to believe" as being tantamount to probable cause. *McMullen v. INS*, 788 F.2d 591, 599 (9th Cir. 1986), *overruled on other grounds by Barapind v. Enomoto*, 400 F.3d 744, 751 n.7 (9th Cir. 2005) (en banc) (per curiam). Under our precedent, we must uphold the Board's conclusion that an alien is ineligible for relief if that determination is supported by "substantial evidence." *See id.* "We may reverse the decision of the Board only if the applicant shows that the evidence *compels* the conclusion that

the asylum decision was incorrect." *See Gu v. Gonzales*, 454 F.3d 1014, 1018 (9th Cir. 2006).

**[1]** We agree with the Board's ruling that Go's drug-trafficking activities prior to entering the United States bar him from obtaining asylum and withholding relief. In considering drug-trafficking offenses under the INA, we have consistently deferred to the Board's conclusion that these offenses presumptively constitute "particularly serious crimes." *See Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007) (evaluating whether an alien was statutorily eligible for withholding under a similar provision contained in 8 U.S.C. § 1231(b)(3)(B)(ii)). Because "a 'particularly serious crime' is more serious than a 'serious nonpolitical crime,' " it follows that drug trafficking is presumptively a serious offense under sections 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii). *See In re Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1982), *modified on other grounds by In re C-*, 20 I. & N. Dec. 529 (B.I.A. 1992); *Ramirez-Peyro v. Gonzales*, 477 F.3d 637, 639 (8th Cir. 2007) (treating drug trafficking as a "serious nonpolitical crime" under the INA). Here, Go points to nothing to rebut the presumption that his drug-trafficking offense constitutes a serious crime, and he does not identify any facts showing that his offense had some "political aspect" or "political objective." *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 429 (1999) (explaining that a serious crime is nonpolitical if it lacks a "political aspect" or "is grossly out of proportion to the political objective" (internal quotation marks omitted)). We therefore accept the Board's conclusion that Go's drug-trafficking offense constitutes a serious nonpolitical crime.

**[2]** We also agree with the Board's determination that there are serious reasons for believing that Go actually committed this offense. During his removal hearing, Go explicitly admitted under oath to being involved in a scheme to finance "drug transactions" while living in the Philippines. He then stated that he knowingly drove an accomplice to "drug deals"

for a period of six months. These admissions are sufficient to establish probable cause for believing that Go engaged in a drug-trafficking scheme before entering the United States. *See McMullen*, 788 F.2d at 599; *United States v. Brady*, 819 F.2d 884, 889 (9th Cir. 1987) (defendant's admission to a particular offense is sufficient to establish probable cause to believe that he actually committed that offense). Because the record does not compel the conclusion that probable cause was lacking, we must uphold the Board's conclusion that Go's offense renders him ineligible for asylum and withholding relief under sections 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii). *See Gu*, 454 F.3d at 1018.

## IV.

**[3]** Although Go's drug-trafficking crime renders him ineligible for asylum and withholding of removal, that offense does not affect his eligibility for deferral relief under the CAT. *See* 8 C.F.R. § 1208.17(a); *Ramirez-Peyro*, 477 F.3d at 639. To prevail under the CAT, "an applicant must show 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.' " *Santos-Lemus v. Mukasey*, 542 F.3d 738, 747 (9th Cir. 2008), *quoting* 8 C.F.R. § 1208.16(c)(2). The applicant must also demonstrate that the torture will "be inflicted 'by or at the instigation of or with the consent or acquiescence of a public official.' " *Id*., *quoting* 8 C.F.R. § 1208.18(a)(1). The Board's denial of an applicant's CAT claim will be overturned only if the evidence would compel a reasonable factfinder to conclude that it is more likely than not that the alien will be subjected to torture. *Hamoui v. Ashcroft*, 389 F.3d 821, 826 (9th Cir. 2004).

**[4]** Although some instances of abuse and mistreatment have been reported in Philippine detention facilities, the Board reasonably concluded that it is unlikely that Go will be tortured in the Philippines. We have emphasized that the lack of harm to similarly situated family members and close associates generally undercuts an alien's fear of harm at the hands

of the government. *See, e.g.*, *Rodriguez-Rivera v. INS*, 848 F.2d 998, 1006 (9th Cir. 1988). Here, Go was not the only person charged with kidnapping King. Yet, one of his alleged accomplices has been detained for some time without harm or incident. Similarly, while several of Go's family members have been charged with participating in Go's alleged crimes, none has been taken into government custody, placed in a detention center, or tortured. *See id.*

**[5]** The likelihood of torture is further reduced in this case because the Philippine government has ordered that the kidnapping charges against Go be dismissed. If Go is no longer subject to a criminal prosecution in the Philippines, it follows that he is unlikely to be detained, let alone tortured. Similarly, Go's ability to defend successfully against his kidnapping charges indicates that he will not be unable to vindicate his legal rights upon return to the Philippines, including his right to seek protection from illegal torture. *See* An Act Penalizing Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment and Prescribing Penalties Therefore, Rep. Act No. 9745 (Nov. 10, 2009) (Phil.) (prohibiting torture and enacting harsh penalties on those that abuse or otherwise mistreat individuals "placed under investigation or held in custody").

Moreover, even if the kidnapping charges do go forward, additional evidence supports the Board's finding that Go is not likely to be tortured in the Philippines. At Go's second hearing before the IJ, Tajanlangit, a former prosecutor in Cebu, testified that torture is not common in the facility where Go would be detained. Tajanlangit stated that "nothing untoward" would happen to Go if he is detained during the pendency of a potential trial. Rather, the "controversial" nature of Go's case would increase public scrutiny over the government's conduct and would "make[ ] it unlikely that an ill-intentioned officer would believe that he could abuse [Go] without being reported in the press."

**[6]** Go counters that his credible testimony and the country reports in the record compel the conclusion that he is likely to be tortured. We disagree. Although Go testified that he fears torture if detained while awaiting trial, other evidence supports the Board's conclusion that his fear is unfounded. As we have explained, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Singh-Kaur v. INS*, 183 F.3d 1147, 1150 (9th Cir. 1999) (internal quotation marks omitted); *see also Castro-Perez v. Gonzales*, 409 F.3d 1069, 1072 (9th Cir. 2005) (indicating that even when an alien's testimony is credited, an immigration court may also consider the other evidence contained in the record in reaching its decision). Thus, Go has not sustained his burden of proof on his CAT claim.

**[7]** Go correctly points out that the country reports describe several instances of abuse and corruption within the Philippine criminal justice system. Nevertheless, other information contained in these reports supports the Board's conclusion that torture is unlikely. *See Gonzalez-Hernandez v. Ashcroft*, 336 F.3d 995, 999-1000 (9th Cir. 2003) (explaining that the Board may use its expertise in considering "contradictory" and "ambiguous" country reports and "decid[ing] which portions of the report are relevant to the applicant"). According to these reports, Philippine officials are "more likely to follow correct procedures" when a criminal suspect hails from "an influential position or is of a higher social status." Here, the undisputed record provides that Go belongs to an affluent family that maintains a fairly high social status in the Philippines.

**[8]** Similarly, while the country reports contain generalized evidence suggesting a relatively high level of mistreatment and abuse, the "notoriety" of Go's kidnapping charges supports the conclusion that Go is unlikely, under the *specific* circumstances of this case, to be harmed or mistreated in the Philippines. *See Afriyie v. Holder*, 613 F.3d 924, 933-34 (9th

Cir. 2010) (explaining that the Board may give specific evidence greater weight than general information contained in a country report). Viewing the record as a whole, we therefore hold that substantial evidence supports the Board's conclusion that Go is not likely to be tortured upon return to the Philippines, and thus Go did not meet his burden of proof.

## V.

**[9]** Finally, we reject Go's argument that he was deprived of his right to due process. As we have explained numerous times, the Fifth Amendment guarantees due process in immigration proceedings. *See, e.g.*, *Lara-Torres v. Ashcroft*, 383 F.3d 968, 973 (9th Cir. 2004). This requires that "an alien [be] given a full and fair opportunity to be represented by counsel, to prepare an application for . . . relief, and to present testimony and other evidence in support of [that] application." *Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 926 (9th Cir. 2007).

**[10]** Go contends that the Board and the IJ violated his due process rights by crediting and relying on Tajanlangit's testimony, which Go describes as "questionable" and "inconsistent with reality." Although the government does not usually present live witnesses during an alien's removal hearing, nothing precludes the government from doing so. Under our precedent, "[t]he sole test for admission of evidence" in immigration proceedings "is whether the evidence is probative and its admission is fundamentally fair." *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 823 (9th Cir. 2003) (internal quotation marks omitted). Tajanlangit's testimony, which was clearly relevant and based on personal knowledge, did not deprive Go of a fundamentally fair proceeding. *See id.* Go had the opportunity to cross-examine Tajanlangit, to present contrary evidence, and to impeach his testimony. There is nothing in the record compelling the conclusion that Tajanlangit's testimony somehow precluded Go from presenting his claims for relief.

**[11]** Moreover, this case does not involve a true credibility determination. Neither the Board nor the IJ ruled Tajanlangit to be truthful or untruthful. Instead, the immigration courts simply weighed the probative value of inconsistent and varying testimony to determine where the preponderance fell. *See Ochave v. INS*, 254 F.3d 859, 866 (9th Cir. 2001) (even if the evidence can be read as supporting a credible applicant's claims, when there is "substantial evidence tending in the other direction[,] . . . our standard of review dictates" that we defer to the Board). That the Board ultimately weighed the totality of the evidence in the government's favor and held that Go failed to meet his burden of proof did not deprive Go of his right to due process. *See id.*

**PETITION DENIED.**